THE CITY OF KANSAS CITY *et al.* v. THOMAS A. CULLINAN *et al.*

No. 12,626.  ([68 Pac. 1099.)

SYLLABUS BY THE COURT.

1. CITIES AND CITY OFFICERS—*Special Assessment—Publication of Ordinance — Injunction — Limitation of Action.* Where the mayor and council of a city of the first class pass an ordinance levying special assessments for paving, and require the city clerk to cause such ordinance to be published in a daily newspaper, and where such clerk does procure the publication to be made, but, because of numerous errors appearing therein, ignores the same and causes the ordinance to be correctly published on the day following, and thereupon makes a memorandum in his ordinance book showing that such ordinance was published on the latter day, an action brought within thirty days from said last publication will be held to have been commenced in time to save the bar of the special statute of limitations created by section 766, General Statutes of 1901.

2. ———— *Estimate of City Engineer—Time for its Submission.* The detailed estimate required by section 747, General Statutes of 1901, to be submitted to a city council by the city engineer before any "work or improvement shall be commenced," need not be so submitted before the mayor and council adopt a resolution declaring such improvement necessary, but must be prepared and filed before any liability in respect to such proposed improvement is incurred on behalf of such city.

3. ——— *Authority of General Manager of Town Site Company to Sign Paving Petition.* One who is the general manager of a town site company will be presumed to have authority to sign such a petition as is required by section 730, General Statutes of 1901, for and on behalf of such corporation, and the fact that he had previously signed similar petitions for improvements for which his principal had, without objection, paid out large sums of taxes is evidence tending to show the existence of such authority, and is not contradicted or overthrown by proof that the records of the company do not show that he was ever given any "specific authority" to sign that or any similar petition.

Error from Wyandotte court of common pleas; W. G. Holt, judge. Opinion filed May 10, 1902. Reversed.

*T. A. Pollock*, city counselor, and *M. J. Reitz*, city attorney, for plaintiffs in error.

*Angevine & Cubbison*, for defendants in error.

The opinion of the court was delivered by

Ellis, J.: These proceedings in error were brought by the city of Kansas City, Kan., *et al.*, to review a judgment rendered May 19, 1900, in the court of common pleas of Wyandotte county, enjoining the collection of assessments levied by said city for the cost of repaving Kansas avenue from the west end of the bridge over the Kansas river to the west line of Mill street. For this improvement a petition was presented to the mayor and city council on the 8th day of February, 1898, signed by the resident property-owners of 4704 front feet, out of a total of 5290 front feet, of the lots facing the part of said street proposed to be paved. For 3141 feet of these lots the petition was signed: "Kaw Valley Townsite and Bridge Company, by Charles F. Morse, manager, by authority of the board of directors. Attest: E. E. Richardson, secretary." Said town site and bridge company is a

Kansas corporation.   It is, and was at the trial below, earnestly contended by defendants in error that said Morse had no authority to sign such petition for said corporation, and it is certain that the court of common pleas based its decision herein upon a finding not given in the record that such authority did not exist.   Upon the filing of such petition, and on the same day, the mayor and city council adopted a resolution declaring it necessary to repave said Kansas avenue, agreeably to the prayer of said petition.

On the 8th day of March, the city engineer submitted to said city a detailed estimate of the cost of such improvement, in accordance with the requirements of paragraph 747, General Statutes of 1901.   It is urged, on behalf of the defendants in error, that said detailed statement was required by law to have been filed prior to the adoption of said declaratory resolution.

On the 19th day of July, 1898, the council passed an ordinance ascertaining the cost of said repaving, and levying special assessments, the collection of which was enjoined as aforesaid.   That ordinance was first published on July 21, but, as many errors appeared in such publication, the city clerk caused the same to be republished on the following day, and entered in his record the fact that it was published in the Kansas City, Kan., *Gazette* on July 22, 1898.   This suit was brought within the thirty days limited by paragraph 766, General Statutes of 1901, if the publication of the ordinance occurred on July 22, but the city, as plaintiff in error, contends that the publication on July 21, although in part erroneous, was legal, and it insists that the action was barred because it was not brought within thirty days thereafter.

Considering these propositions in inverse order, we

do not think that, after the publication of July 21 was abandoned and ignored by the city clerk, the city may now be heard to say that such publication caused the special statute of limitations, above cited, to begin to run, and we think this action was brought within the time therein limited. The duty of causing such publication to be made devolved upon the city clerk, and included an obligation on his part to cause such ordinance to be accurately published. When the first attempt to fulfil that duty proved abortive, and he determined that which had been done to be insufficient, in the discharge of the responsibilities resting upon him it was within his province, as a ministerial officer, to decide and act precisely as he did, and the corporation which he represented ought not to be permitted to dispute his authority so to do. (Dill. Mun. Corp. §§ 96, 531.)

1. Publication of ordinance—limitation of action.

The pertinent part of section 747, General Statutes of 1901, cited *supra*, reads as follows :

"Before the building of any bridge or sidewalk, or any work on any street, or any other kind of work or improvement, shall be commenced by the city council, or under their authority, a detailed estimate of the cost thereof shall be made under oath by the city engineer and submitted to the council ; and in all cases where the estimated cost of the contemplated work or improvement amounts to one hundred dollars, sealed proposals for the doing or making thereof shall be invited by advertisement, published by the city clerk in the official newspaper of the city for at least three consecutive days, and the mayor and council shall let the work by contract to the lowest responsible bidder, if there be any such whose bid does not exceed the estimate. If no responsible person shall propose to enter into contract at a price not exceeding the estimated cost, all bids shall be rejected, and the same proceedings as before re-

2. Submission of engineer's estimate.

peated, until some responsible person shall, by sealed proposal, offer to contract for the work at a price not exceeding the estimated cost. In no case shall the city be liable for anything beyond the estimated cost, or the original contract price for doing such work or making such improvement.''

It is quite apparent that the purpose of this section is to prevent fraud and imposition in the letting of contracts, as well as to inhibit the creation of a liability against the city by the mayor and council before the maximum cost of a proposed improvement shall be known. In effect, it is provided that the preliminary things to be done by those who control the financial affairs of a city shall not be completed, so that in due course contractors, or others who perform the actual work of construction, may be permitted to incur expense for which the city is held to respond, until after those empowered to act for such city are fully advised of the extent of the undertaking, and the amount for which the city will become amenable because thereof.

The insistence of counsel for defendants in error that such detailed statement must be filed before the passage of the declaratory resolution by the council finds no warrant in the letter of the statute, and is not sustained by a consideration of its aims and purposes. Presumably such declaratory resolution will be sufficiently specific to apprise taxpayers of the general nature of the contemplated improvement, and to afford data from which some idea of the probable cost likely to be incurred may be ascertained, and, as the principal matter for consideration by such taxpayers is whether or not the betterment intended is really necessary, a sufficient basis for a protest, such as is permissible under section 730, General Statutes of 1901, is furnished them. Besides, in the case of a

city of over 25,000 inhabitants, a petition for paving must be filed, as was done in this case, which petition must "state the width of the paving, and a specific description of the material to be used." (Sec. 730, *supra*.) We conclude, therefore, that the declaratory resolution of the city council, to which we have referred, was not prematurely passed, and the subsequent proceedings were not rendered defective because the detailed statement had not been filed at the time such resolution was adopted. This construction results in harmonizing the several sections of the statute referred to, and is consonant with their terms and evident intent, and in furtherance of the ends sought to be attained.

The principal matter of controversy in this case is whether the general manager of the Kaw Valley Townsite and Bridge Company had authority to sign such petition for paving, and the agreed statement of facts, after reciting that said Morse was such general manager, contains the following :

3. Authority of general manager to sign petition.

"*Sixteenth.* Neither the charter, constitution, nor by-laws, nor any other paper or record of the Kaw Valley Townsite and Bridge Company, expressly confers upon said C. F. Morse, nor any other person, specific authority to sign said petition, or any petition to pave or repave said street, or any street, or in any manner refers to that subject ; the question of paving or repaving Kansas avenue or any other street had never been considered by the board of directors of said company before said petition was presented and acted upon, nor afterwards except as hereinafter stated.

"*Seventeenth.* On the 12th day of September, 1898, Charles F. Adams was president and E. E. Richardson was secretary of the Kaw Valley Townsite and Bridge Company, and Charles F. Adams, Charles F. Adams, 2d, Charles F. Merriam, H. H. Hunnewell, John A. Burnham, and Nathaniel Thayer, all of Bos-

ton, Mass., and C. W. Blair, of Leavenworth, Kan., and E. S. W. Drought, of Kansas City, Kan., and L. E. James, of Kansas City, Kan., were the directors of said company; C. W. Blair, E. S. W. Drought, and L. E. James, immediately upon being elected directors, filed with the company a written waiver of notice of all special meetings of the board of directors of the company.

"*Eighteenth.* On September 12, 1898, Charles F. Adams 2d, Charles F. Merriam, H. H. Hunnewell, John A. Burnham, and Nathaniel Thayer, directors of said company, met in Boston, Mass., in pursuance to a call for a meeting of the board of directors, and adopted a resolution, which was entered upon the record of the proceedings of the said board of directors under said date of September 12, 1898, in words following to-wit:

"'Whereas, On February 8, 1898, C. F. Morse, general manager of the Kaw Valley Townsite and Bridge Company, signed a certain petition presented to the mayor and council of Kansas City, Kan., to have Kansas avenue paved from the west end of the bridge over the Kansas river to the west line of Mill street; and

"'Whereas, Said general manager has been authorized by the board of directors of said company to perform this and similar acts:

"'*Resolved*, That the action of General Manager Morse in signing aforesaid petition is hereby ratified and approved.'

"Charles F. Adams, C. W. Blair, L. E. James, and E. S. W. Drought, directors of said company, were not present at said meeting and had no notice thereof, but C. W. Blair, L. E. James and E. S. W. Drought had waived notice thereof, as stated in paragraph 17 of this agreed statement.

"*Nineteenth.* That on January 18, 1899, at the regular annual meeting of the stockholders of the Kaw Valley Townsite and Bridge Company, called and held in accordance with the by-laws of said company, the proceedings of the board of directors of said com-

pany were reported, and by a unanimous vote of the
stockholders the following resolution was adopted :

" ' *Voted:* That the acts and proceedings of the
board of directors and executive committee from June
13, 1898, to September 12, 1898, both dates inclusive,
as the same appear in the records of the company as
presented to this meeting, be and the same are hereby
fully ratified and approved.' "

" *Twentieth.* Charles F. Morse has been the general
manager for and had charge of the business of the
Kaw Valley Townsite and Bridge Company at Kan-
sas City, Kan., ever since the organization of the
company, in July, 1879, and as such general manager
he had signed the name of the Kaw Valley Townsite
and Bridge Company to petitions for the following
special improvements in Kansas City, Kan., to wit :

"May, 1888.—For, paving of Kansas avenue be-
tween Fourth street and Sixteenth street with cedar
blocks.   April, 1888.—For grading Osage avenue be-
tween First street and western city limits.   April,
1888.—For grading Kansas avenue between Fourth
street and state line.   April 8, 1888.—For paving
Osage avenue between First street and western city
limits.   April, 1889.—For grading and paving Eighth
street from Osage avenue to Kansas avenue.   The pe-
titions for the improvements last above mentioned
were signed : 'Kaw Valley Townsite and Bridge Com-
pany, by Charles F. Morse, manager.'

"That with the actual knowledge of C. F. Morse,
general manager, and E. E. Richardson, secretary
and treasurer, and L. E. James, E. S. W. Drought,
C. W. Blair, directors, said special improvements
prayed for in said petitions were made by the city of
Kansas City, Kan., in pursuance and by reason of
said petitions, and special assessments were made
against the property of said company to pay therefor,
and said special assessments have been paid by said
company to the amount of over $77,000 without ob-
jection."

It will be observed that the attempted ratification
by the board of directors of the town site company did

not occur until after this suit was brought. In the view we have taken of the case, it is not necessary for us to decide whether such ratification would relate back to the time of the signing of the petition, notwithstanding the intervention of the rights of the plaintiffs below in this action. We do not determine the question, but think that, in principle and upon authority, it is a matter of grave doubt whether such retroactive effect can be accorded to an act of ratification in a case like the present.

It will be noted that this is a town site and bridge company, and, while we are not apprised of the extent of its real-estate holdings, the record in this case shows that upon the street in question, which is one of the principal thoroughfares of Kansas City, it owned approximately three-fourths of the abutting lots opposite the pavement sought to be constructed, and, from the agreed statement of facts above quoted, it appears that for grading and paving in said city, within the past few years, it had paid out $77,000. Presumably this town site company has its lots for sale, and is desirous of doing that which will render such lots more valuable and salable, and it may, with propriety, be assumed that its general manager is invested with power to conserve and carry out those purposes. It cannot be doubted that the building of good streets adds materially to the value of the property on either side thereof, and to favor such improvements, to urge and aid their accomplishment, are but manifestations of good business policy on behalf of such corporation. The owners of a major portion, or, as counsel for defendants in error say, substantially all of the stock of the town site company, are residents of a distant state, while their interests are represented by a person designated by them as "general mana-

ger," who resides at the place where their property is located, and who, from necessity, must frequently act without consultation with them, and upon his own judgment. He is not styled an "agent," but is given the broad and comprehensive title of "general manager," and those with whom the corporation deals, as well as the public generally, are authorized to infer that he has the general management and control of the property and interests of the company placed in his hands. As to them, with some limitations which it is not necessary to consider, he is the corporation itself.

"A general manager of a corporation has been defined to be a person who really has the most general control over the affairs of the corporation, and who has knowledge of all its business and property, and can act in emergencies on his own responsibility; who may be considered the principal officer." (14 A. & E. Encycl. of L., 2d ed., 1002.)

In the case of *The Wheeler & Wilson Manuf'g Co. v. Lawson and another*, 57 Wis. 404, 15 N. W. 400, the court, speaking of "general manager," said:

"The very term implies a general supervision of the affairs of a corporation in all departments; perhaps to a greater extent than is implied by the term, any other single officer so-called, such as president, cashier, secretary, treasurer, etc." (See, also, *R. E. Lee S. M. Co. v. O. & G. S. & R. Co.*, 16 Colo. 122, 26 Pac. 327; *Spangler v. Butterfield*, 6 id. 356.)

In the case of the *A. & P. Rld. Co. v. Reisner*, 18 Kan. 458, 460, this court said:

"In other words, the general agent of the company is virtually the corporation itself. It has been usual in the constructing and operation of railroads in this state for some person therewith connected to act as general manager, or general agent, of the railroad being constructed or operated; and such general man-

ager or general agent has had, while occupying this position, the full control of all the company's affairs and complete direction over its treasury. General manager, and general agent, are synonymous terms.''

In that case, from the mere fact that a witness testified that one Mr. Hyde was the general agent of a railroad at Atchison, as well as its station agent there, this court presumed that, as such general agent, he had authority ''to employ a hotel-keeper to furnish board and attendance at the expense of the company to a brakeman injured while working for such company.'' (See, also, *Atchison & N. R. Co. v. Reecher*, 24 Kan. 228; *Pacific Rld. Co. v. Thomas*, 19 id. 256; *Central Branch Rld. Co. v. Ingram*, 20 id. 66.)

In the case of *St. L. Ft. S. & W. Rld. Co. v. Grove*, 39 Kan. 731, 735, 18 Pac. 958, it was said:

''As the general manager of a railroad company has full control of all the company's affairs, and complete direction over its treasury, we must assume that Miller had authority to employ Grove, or direct Forbes to employ him.''

In *Insurance Co. v. Gray*, 43 Kan. 497, 23 Pac. 637, it was said in the syllabus:

''A general agent of an insurance company can modify the insurance contract or waive a condition of a written policy by parol.''

''A provision in an insurance policy respecting encumbrances on the property insured may be waived by the insurance company or its general agent; and this although the policy contains a printed stipulation that no agent of the company or any person other than the president or secretary shall have authority to waive any of the terms or conditions of the policy, and all agreements by the president or secretary must be signed by either of them.''

In the opinion, at page 505, it was said, referring to the last provision above mentioned :

"This provision, however, may be modified by the company to the same extent as any other ; and whatever the company can do may be done by its general agents."

Under the facts above given and the authorities cited, we think it our duty to presume that Morse was in fact authorized to enter into any lawful engagement on behalf of his principal, the natural tendency of which would be to render its property more desirable and valuable. That such corporation regarded improvements of that kind as promotive of its interests, and that it had, long before the controversy in this case arose, impliedly authorized said Morse to act for it in signing petitions for paving the streets of Kansas City, may be fairly inferred from the fact that he had thus signed several others which had resulted in the payment of large sums in taxes by such corporation.

"The fact and scope of an agency may be determined, not alone by what the principal may tell the agent to do, but also from what he knows, or in the exercise of ordinary care might know, as to what the agent is doing." (*Cain v. Wallace*, 46 Kan. 141, 26 Pac. 446.)

In the case of *Bronson's Executor v. Chappell*, 12 Wall. 681, 683, 20 L. Ed. 436, 437, it was said :

" If business has been transacted in certain cases, it is implied that the like business may be transacted in others. The inference to be drawn is, that everything fairly within the scope of the powers exercised in the past may be done in the future, until notice of revocation or disclaimer is brought home to those whose interests are concerned."

In the case of *Allen v. City of Portland*, 35 Ore. 444,

58 Pac. 515, the authority of a Mr. Pittock to sign a petition for a street improvement for a corporation was in issue.   The court said :

"Authority in the agent of a corporation may be inferred from the conduct of its officers, or from their knowledge and neglect to make objection, as well as in the case of individuals." (Citing *Sherman v. Fitch,* 98 Mass. 59.)

A similar rule has been held to exist even as to servants.   In *A. T. & S. F. Rld. Co. v. Johns,* 36 Kan. 769, 14 Pac. 237, it was said in the syllabus :

"As such servants were then on the company's premises, performing this duty for the company, in the presence of other servants, and as they had performed similar services on prior occasions, *held,* that it will be presumed that they were acting within the scope of authority given to them by the railroad company."

It is also worthy of consideration that in the second clause of the preamble adopted by the board of directors on September 12, 1898, it is recited that "said general manager *has* been authorized to perform this and similar acts."   True the tense is faulty, but we cannot doubt that the word "has" was intended to have the significance and meaning which would have been given to "had," if the latter word had been chosen instead.

If, then, we are required to presume that Morse was authorized to sign the petition and bind the town site company, and if the evidence above referred to strongly tends to prove such fact, it becomes important to inquire whether there is any evidence in the record which will sustain the finding of the court below to the effect that he was not so empowered.   The general finding must be construed as a holding that Morse had no power to act in the premises, and if there be

any evidence in the record to justify it the conclusion of the trial court must prevail. Reliance is placed on the sixteenth paragraph of the agreed statement of facts, as affording grounds for the determination of the court below. It will be noted, however, that it is stipulated merely that the records of the corporation do not show that Morse had any "*specific* authority to sign said petition or any petition." Now, it is clear that no specific authority was necessary, for an agent may have implied as well as express power to perform an act, and his principal is as much bound by the former as the latter, even as to the parties themselves. The latter clause of said paragraph does not sustain the trial court, because the fact that the corporation had previously paid out so large a sum as $77,000 for grading and paving taxes, without any consultation by its board of directors over the matter of paving streets, tends to show that such matters were left wholly to the representative of the company who was upon and near the property, and, therefore, knew better than any other officer could the necessities and opportunities presented.

The fact that after this suit was commenced a resolution of ratification was adopted by the board of directors cannot be held to sustain the finding, for, as above stated, such resolution contains a recital that said Morse performed the act in pursuance of authority with which he was then invested. Such a resolution would probably not be admissible to prove the fact that Morse had been previously given dominion over the matters therein referred to, but it is competent evidence to rebut an inference which might be drawn to the contrary from the act of ratification, which, of course, would be unnecessary, although harmless, if the agent had acted clearly within the

6—65 KAN.

scope of his agency. As the agreed statement of facts confessedly contains all that bears upon the matter, we conclude that there was no evidence adduced at the trial which tended to dispute, or could be regarded as overcoming, the presumption and proof of the authority of Morse to sign the petition on behalf of the corporation.

The judgment of the court of common pleas is reversed, and a new trial granted.

DOSTER, C. J., JOHNSTON, J., concurring.